UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JESSIE PALMER,

Plaintiff,

v.

SILVUR INSURANCE SERVICES, LLC,

Defendant.

Case No. 1:26-cv-1613

Hon. Hala Y. Jarbou

**OPINION**

Before the Court is Defendant Silvur Insurance Services LLC's motion for a preliminary injunction. In its motion, Silvur alleges Palmer (1) violated the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1839, (2) violated the Michigan Uniform Trade Secrets Act (MUTSA), Mich. Comp. Laws § 445.1901 *et seq.*, and (3) breached the terms of her employment contract. Silvur seeks an injunction to prevent Palmer from retaining, using, or disseminating information it views as confidential or a trade secret, and to compel her to return all such information in her possession to Silvur. On September 8, 2026, the Court denied Silvur's motion in part on the grounds that Silvur has failed to plead breach of contract and thus cannot seek equitable relief on a nonexistent claim. (ECF No. 23.) The court held an evidentiary hearing on the remainder of the motion on September 28, 2026. For the reasons discussed below, the Court will deny Silvur's motion for preliminary relief on its trade secret claims.

## I. BACKGROUND

Silvur is an insurance company that specializes in selling Medicare policies through its partnerships with regional credit unions. In June of 2024, the company hired Jessie Palmer to build out its business in Michigan, where Silvur had no presence at the time. (Am. Compl. ¶ 23,

ECF No. 5.) Palmer's employment agreement contained a confidentiality provision.[1] In the contract, Confidential Information was defined capaciously to include, among other things:

> Customer and Prospective Customer identities . . . Customer, and Prospective Customer lists, . . . Customer and Prospective Customer contacts, unique or highly sensitive details concerning particular Customers, and Prospective Customer insurance coverages, or insurance requirements . . . and any other information treated as confidential by the Company, whether or not stamped or designated as such, so long as such Confidential Information is not otherwise publicly available

(Emp. Agreement § 6(b), ECF No. 1-1.) The contract defines "Customer" and "Prospective Customer" similarly. Relevant here, the terms include "policy holders, . . . or prospective policy holders . . . to whom the Company provides, [or] attempts to provide, insurance products and related services." (*Id.* § 6(c).) Under the employment agreement, "Confidential Information is the exclusive property of" Silvur. (*Id.* §6(d).) Palmer also agreed to the following restrictions on her handling of Silvur's confidential information:

> Employee shall not, without the prior written consent of the Company . . . use for the Employee's benefit or others or disclose to any third party by any method whatsoever any of the Confidential Information. If Employee's employment hereunder is terminated for an reason or upon the Company's request, Employee shall return all Confidential Information to the Company immediately upon its request and shall not take originals or copies of any records, papers, programs, computer software, and documents of whatever nature containing Confidential Information.

(*Id.* § 6(e).)

Silvur employs both technical and administrative measures to protect its Confidential Information. During Palmer's employment, Silvur stored its confidential customer information in a secure database using a program called AgencyBloc. According to a declaration by Christopher

[1] The parties signed a second employment agreement on May 12, 2025. (Am. Compl. ¶¶ 27–31.) They do not dispute that the May 12, 2025, employment agreement retains the same confidentiality language as the First employment agreement signed on June 7, 2024.

Leckrone, the Head of Legal and Compliance at Silvur's parent company, AgencyBloc allows Silvur to maintain in a readily accessible format vast amounts of health data, financial information, policy data, and other identifying markers for both current and prospective customers. (Leckrone Decl. ¶ 13, ECF No. 18.) Silvur restricts access to the data stored in AgencyBloc to authorized personnel. (*Id.* ¶¶ 8–9.) The information is encrypted both in storage and transmission, and Silvur employees can only access Silvur company information on Silvur-provided devices. (*Id.* ¶ 11.) Access to AgencyBloc is revoked when an individual's employment terminates. (*Id.* ¶ 12.)

During her employment with Silvur, Palmer primarily worked from home but would occasionally commute to a company office in Lansing. (Answer ¶¶ 5–7, ECF No. 7.) Palmer "secured information" about the customers she worked with, the policies she wrote for them, and the nature of her relationships with those customers during her employment. (Am. Compl. ¶ 69.) At home, Palmer "maintained systems" to secure this information. (*Id.* ¶ 70.)

On April 9, 2026, Silvur terminated Palmer's employment. (*Id.* ¶ 61.) In the lead-up to her termination, Palmer became concerned that Silvur was not fully compensating her for commissions that she believed she had earned. (Palmer Decl. ¶ 10, ECF No. 15.) After Silvur declined her request for customer information to reconcile her commission claims (*id.* ¶ 11), Palmer downloaded several spreadsheets from AgencyBloc that included confidential customer information for clients she had written policies for, the date on which she wrote those policies, and the amount owed on each account. Palmer's stated purpose for downloading this information was to retain it as evidence of the policies she wrote during her tenure. (*Id.* ¶ 15.) While Silvur alleges that Palmer downloaded more information than necessary to make her commissions claim, Palmer testified that this was an incidental result of the download parameters she set within AgencyBloc.

Palmer has since passed these AgencyBloc reports to her attorney and does not hold any of Silvur's confidential information herself. (*Id.* ¶ 18.)

Palmer, however, can still view Silvur's information in portals administered by the major insurance carriers. These carrier portals contain information on current Silvur customers, including their names, addresses, policy information, and direct deposit details. In the portals, individual agents are "appointed" with specific agencies. (*Id.* ¶ 21.) On the day of her termination, Palmer was appointed with 17 insurance carriers on Silvur's behalf. (*Id.*) Palmer has since been released from four appointments but remains appointed with 13 carriers, which means she can view Silvur's customer information on those 13 carrier portals. (*Id.* ¶¶ 23–27.) For its part, Silvur asserts that the information stored in AgencyBloc is distinct from the information on the carrier portals in part because it is comprised of detailed financial records derived from Silvur's partnership with Michigan State University Federal Credit Union (MSUFCU) and its members. (Leckrone Decl. ¶ 13.) At the evidentiary hearing, Russell Campbell, the head of Silvur Insurance, testified that AgencyBloc also contains information on prospective customers, who would not be included on the carrier portals.

Palmer categorically denies using "Silvur's customer information for [her] own business purposes." (Palmer Decl. ¶ 20.) She also insists that she does not write insurance for clients she worked with while employed at Silvur. (*Id.* ¶ 19). Silvur, however, has introduced evidence that Palmer has been in contact with Silvur customers, at least one of whom she used to write policies for while employed by the company. (Leckrone Decl. ¶¶ 14–15.) While Palmer does not deny that she has occasionally fielded general Medicare and insurance questions from Silvur customers she used to work with, she testified that those customers have been the ones to initiate contact.

Lurking in the background of this skirmish is the party's primary dispute—Palmer believes that Silvur owes her a significant amount of money; Silvur believes that Palmer owes it money. Those contract claims are not the subject of this motion. Nor is this motion about an alleged breach of a nonsolicitation agreement, because Defendant has never raised such a claim. What this motion is about is whether Silvur is entitled to the extraordinary remedy of a preliminary injunction on the theory that Palmer's ongoing or threatened misappropriation of Silvur's trade secrets will cause irreparable harm to the company. No more, no less.

## II. LEGAL STANDARD

Whether to issue a preliminary injunction is in the discretion of the district court. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). A "preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (cleaned up). An injunction at this stage in litigation should "only be awarded upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citation omitted). In evaluating a motion for preliminary injunctive relief, a court considers four factors: (1) whether the movant has established a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the preliminary injunction; (3) whether the balance of the equities weighs in the movant's favor; and (4) whether a preliminary injunction would serve the public interest. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025).

## III. ANALYSIS

### A. Likelihood of Success on the Merits

Under DTSA, a party may seek injunctive relief to "prevent any actual or threatened misappropriation . . . on such terms as the court deems reasonable." 18 U.S.C. § 1836(3)(A)(i).

MUTSA similarly empowers courts to enjoin the "[a]ctual or threatened misappropriation" of trade secrets. Mich. Comp. Laws § 445.1903(1). To succeed on a trade secrets claim, a movant must show (1) the existence of a trade secret and (2) misappropriation. Courts have held that the standards applied to MUTSA and DTSA are "almost identical." *Prudential Defense Solutions, Inc. v. Graham*, 498 F. Supp. 3d 928, 938 (E.D. Mich. 2020); *see also FCA US LLC v. Bullock*, 446 F. Supp. 3d 201, 212 (E.D. Mich. 2020) (citing *Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1124 n.2 (E.D. Mich 2019)). For their part, the parties do not distinguish between the two statutes. Therefore, the Court will consider the state and federal claims together.

**1. Trade Secret**

For information to qualify as a trade secret, two things must be true. *First*, the information must derive value "from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). *Second*, the company must have actually taken reasonable steps to keep the information secret. *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 675 (6th Cir. 2024). The movant must not speak in general terms; its trade secret must be "specifically identified and its unique economic value explained." *Furstenau*, 368 F. Supp. 3d at 1124.

Generally, "customer lists developed by a former employee and information relating to a customer's needs are not 'trade secrets.'" *Wysong Corp. v. M.I. Industries*, 412 F. Supp. 2d 612, 629 (E.D. Mich. 2005) (quoting *Mckesson Medical-Surgical Inc. v. Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 597–98 (E.D. Mich. 2003)). For customer contact information to qualify as a trade secret, an employee must be bound by a confidentiality agreement. *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 615 (Mich. 1984). Even when customer information is covered by a confidentiality agreement, "courts generally distinguish, on one hand, lists of customers 'discoverable only through extraordinary efforts' . . . and, on the other hand, lists of customers whose identities as

purchasers of a given type of product may be" ascertainable through readily available legitimate alternatives. *Raymond James & Associates, Inc. v. Leonard & Co.*, 411 F. Supp. 2d 689, 694 (E.D. Mich. 2006) (quoting *ATC Distribution, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 714 (6th Cir. 2005) (applying Kentucky's Uniform Trade Secrets Act, which contains an almost identical definition of trade secret to those found in MUTSA and DTSA)). The former category of customer information—that information discoverable only through extraordinary effort—is generally protectable as a trade secret, while the latter is not.

Silvur has demonstrated the customer information stored on AgencyBloc is valuable because of its confidential nature. The data maintained on AgencyBloc includes individualized customer health data, plus financial information from MSUFCU clients within a certain age range and financial profile who are eligible for Medicare or soon will be. (*See* Leckrone Decl. ¶ 13.) The company has obtained and curated this data on prospective and current clients through its relationship with MSUFCU, not through publicly available means. (*Id.*) Silvur has also invested significant financial resources to generate these leads, including by hiring Palmer to develop client relationships in Michigan, by licensing the AgencyBloc software, and by partnering with MSUFCU. *See James B. Oswald Co.*, 98 F.4th at 676 (holding considerable investment in acquiring information indicates the information has independent economic value). If this data were made publicly available in the AgencyBloc format, Silvur's competitors would gain an economic advantage by better understanding Silvur's customer base and their needs. *See, e.g.*, *Appalachian Railcar Servs., Inc. v. Boatright Enters., Inc.*, 602 F. Supp. 2d 829, 853 (W.D. Mich. 2008). Accordingly, Silvur obtains an economic value from keeping this information secret.

Silvur has taken significant steps to secure and keep secret the "detailed information about [its] customers" it seeks to protect today. *Laethem Equipment Co. v. Deere & Co.*, No. 05-10113,

2007 WL 2433980, at *18 (E.D. Mich. Aug. 14, 2007). Silvur restricts access to sensitive customer information on a need-to-know basis, and that access is revoked upon an employee's termination. (Leckrone Decl. ¶ 12.) Silvur employees may only access company information through company-provided devices with multi-factor identification. (*Id.* ¶¶ 9, 11.) Moreover, information contained within AgencyBloc is stored and communicated in encrypted formats. (*Id.* ¶ 10.)

Silvur has also protected itself by contract. A confidentiality agreement can provide a basis for classifying customer data as a trade secret. *See Hayes-Albion*, 364 N.W.2d at 615. As noted above, the employment agreement defines "Confidential Information" broadly to encompass "lists of," the "identities of," and "contacts for" both actual and prospective customers. (*See* Emp. Agreement § 6(b).) This information is Silvur's property (*see id.* § 6(d)) and Palmer had a duty to refrain from "disclos[ing] [it] to any third party" or "tak[ing] originals or copies of any . . . documents . . . containing Confidential Information" (*id.* § 6(e)). In sum, Silvur has shown a strong likelihood that its confidential customer information would not be "capable of being acquired by competitors or the general public without undue difficulty." *Wysong Corp.*, 412 F. Supp. 2d at 626 (*quoting Kubik, Inc. v. Hull*, 56 N.W.2d 80, 87 (Mich. Ct. App. 1974)). Therefore, the confidential customer data stored on AgencyBloc is a protectable trade secret.

In opposition, Palmer suggests that the fact that she can access some of Silvur's confidential customer information through insurance carrier portals should defeat a finding that Silvur has taken reasonable steps to protect its customer data. (*See* Palmer Decl. ¶ 26.) This is not so. Even if the information contained in AgencyBloc is duplicated in part on the carrier portals, the information within AgencyBloc is more fine-grained, covers not just current but also prospective customers, and is curated in an easy-to-read format for someone working in the industry. (*See* Leckrone Decl. ¶ 13.) Indeed, this level of detail and curation is why Palmer

downloaded the customer data from AgencyBloc instead of scraping the data on her current and former clients from the carrier portals.

**2. Misappropriation**

The second requirement of a trade secret claim is the existence of actual or threatened misappropriation. DTSA defines "misappropriation" as (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," 18 U.S.C. § 1839(5)(A), or (2) the "disclosure or use of a trade secret of another without express or implied consent," *id.* § 1839(5)(B). A trade secret is acquired through improper means when it is acquired through, among other means, "breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6).

MUTSA similarly bifurcates its definition of misappropriation. Misappropriation occurs either (1) through the "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," or (2) by the "[d]isclosure or use of a trade secret of another without express or implied consent by a person who"

> (i) acquired the trade secret through improper means,
>
> (ii) [a]t the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use, or
>
> (iii) [b]efore a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 445.1902(b). Improper means is defined in a similar manner to federal law.

Silvur argues that Palmer's retention of the documents in breach of her employment agreement and her threatened use of the documents in compensation negotiations amounts to

misappropriation. (*See* Def.'s Br. 9–10, ECF No. 8.) Silvur is correct that Palmer breached her employment agreement, but not for the reasons it offers. Silvur asserts that Palmer had an "absolute" contractual obligation to return all confidential information upon termination. (*See* Reply Br. 10, ECF No. 18.) To be sure, the existence of a confidentiality agreement places an individual on notice that they have a duty to keep secret the information covered by its provisions. *See Henkel Corp. v. Cox*, 386 F. Supp. 2d 898, 903 (E.D. Mich. 2005). But there is no self-enforcing return obligation in § 6(e). Rather, a terminated employee's obligation to return confidential information only triggers "upon the Company's request." (Emp. Agreement § 6(e)). Here, there is no evidence that Silvur made a return request to Palmer or her attorney. Palmer's personal retention of several AgencyBloc reports was instead a breach of her contractual duty to "not take originals or copies of any . . . documents of whatever nature containing Confidential Information." (*Id.*) Additionally, her providing those documents to her attorney breached a separate requirement in § 6(e) barring the disclosure to "any third party . . . of [Silvur's] Confidential Information." (*Id.*) Therefore, Silvur can likely succeed on the claim that Palmer misappropriated its trade secrets because Palmer and her attorney improperly acquired Silvur's confidential customer information in breach of Palmer's duties to keep that information secret.[2] *See Endoscopy Corp. v. Kenaan*, No. 359398, 2023 WL 2439487, at *7 (Mich. Ct. App. Mar. 9, 2023).

[2] Because the Court decides that Palmer acquired Silvur's trade secret through improper means, it declines to consider the other argument raised by Silvur, and referenced obliquely by the parties at oral argument, that Palmer's intent to use this information in litigation over backpay amounts to actual or threatened improper use or disclosure. *See* Restatement (Third) of Unfair Competition § 40 cmt. c (1995) (discussing the scope of the terms "use" and "disclosure," and distinguishing between the impacts of public and private disclosure).

**B. Irreparable Harm**

Even when a party can show it has a strong likelihood of success on the merits of its claim, its work is not finished. "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974). "[T]he *existence* of an irreparable injury is mandatory" for an injunction to issue. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). A movant must "demonstrate 'an injury that is neither remote nor speculative, but actual and imminent.'" *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (quoting *Consol. Brands, Inc. v. Mondi*, 638 F. Supp 152, 155 (E.D.N.Y. 1986)). A district court acts well within its discretion when it declines to issue a preliminary injunction solely on the grounds that the movant has failed to make a credible showing of irreparable harm. *See S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

Here, Silvur primarily argues that it will suffer reputational harm and the loss of customer goodwill through Palmer's commercial use of its confidential consumer information. (*See* Def.'s Br. 11–12.) Silvur alleges that Palmer is currently providing Medicare insurance services to its customers. (*See* Reply Br. 10–11.) But all the examples Silvur offered in its briefing or at the evidentiary hearing are either based on misidentifications or customer confusion. Moreover, none of the examples put forward establish that Palmer is *using* Silvur's confidential information in any discussions that she has had with Silvur customers since her employment was terminated. Therefore, no example provides a basis for finding irreparable harm based on the loss of customer goodwill resulting from Palmer's misappropriation of Silvur's trade secrets.

First, Silvur alleges that Palmer is working with an existing Silvur customer, Nancy Siddall. (Leckrone Decl. ¶¶ 14–15.) But this barebones allegation does not support the weight that Silvur places upon it. To show that Palmer is misappropriating its trade secrets, Silvur must clearly connect Palmer's alleged work with Siddall to her purported access to Silvur's confidential

customer information. It has not done so. At the evidentiary hearing, Palmer credibly testified that she personally knows Siddall, and that Siddall has occasionally reached out to Palmer on her personal cell phone to ask general questions about Medicare and insurance. Palmer also testified that she has reminded Siddall that she cannot provide her Medicare services because she is bound by a nonsolicitation agreement with Silvur. Moreover, as established at the evidentiary hearing, the testimonial from one "Nancy S." on Palmer's website dates to a Google review from 2024, when Palmer worked with Nancy while employed by Silvur. There is nothing in Palmer's interactions with Siddall that indicate use of Silvur's confidential information.

Silvur next alleges that Palmer is working with a second customer, Martha Payne, based on an email that customer sent to Silvur. In early September 2026, Payne notified Silvur that she had received an email from Palmer informing her that her insurer would be going through some significant changes. When confronted with this evidence at the hearing, Palmer credibly denied that she ever sent the email. Rather, it seems that Payne received an automated email from her insurance carrier about a Plan Annual Notice of Change, which Medicare rules require insurers to mail annually to Medicare enrollees before September 30th. *See* 42 C.F.R. § 422.2267(e)(3) (2026). It appears that the email indicated Palmer was the agent of record because Payne's insurance carrier is one of the thirteen carriers where Palmer remains appointed as Silvur's agent.

Finally, Silvur claims that Palmer wrote an insurance policy for another customer, Linda Burns, an individual that Palmer had worked with while at Silvur. Palmer conceded that she wrote a policy for a woman named Linda Burns whom she met a seminar held at the YMCA but testified that that woman is not the same Linda Burns who is an existing Silvur customer. Whether or not it is the same individual is beside the point. The narrow issue is whether Palmer is *using* Silvur's confidential information to poach its existing customers. On that matter, Silvur has offered no

evidence to rebut Palmer's testimony that she met someone named Linda Burns through a YMCA insurance seminar, which Palmer attended on her own initiative and without use of Silvur's confidential customer information.

In its briefs, Silvur repeatedly invokes the rule that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). But that rule is inapposite here because Silvur hasn't demonstrated that its theory of harm is anything more than pure speculation. In *Basicomputer*, the employer presented actual evidence that former employee defendants were soliciting Basicomputer's customers in breach of their noncompete agreement. *Id.* at 509. Evidence of solicitation in that case was prima facie evidence of breach because the employer sued to enforce a noncompete agreement. Here, Silvur proceeds under a different claim. Silvur contends that Palmer's misappropriation of its confidential customer information is causing irreparable harm to the company. But it has not offered any persuasive evidence that Palmer is using its confidential customer information to solicit or do business with its clients. In other words, there is no connection between Palmer's contact with Silvur customers and her misappropriation of its trade secrets. Absent that connection, Silvur's theory of irreparable harm remains speculative at best.

Silvur's inability to connect Palmer's past misappropriation to a nonspeculative reputational harm distinguishes this case from those where courts have found irreparable harm. For example, Silvur has not introduced any evidence that Palmer intends to use its trade secrets in a competing insurance enterprise. *See Handel's Enters., Inc. v. Schulenburg*, 765 F. App'x 117, 124–25 (6th Cir. 2019) (opening ice cream shop while holding onto confidential manual detailing competitor's unique flavors "created strong risk of market confusion, along with the loss . . . of

customer goodwill," *id.* at 125). Nor did Palmer leave for a direct competitor with troves of customer data and pricing documents. *See Mech. Constr. Mgrs., LLC v. Paschka*, No. 21-cv-302, 2022 WL 1591605, at *10 (S.D. Ohio May 19, 2022). Palmer has consistently said that she only intends to use the information as evidence that Silvur owes her unpaid commissions. There is no evidence that Palmer intends to use the information for a commercial purpose, which is why her attorney, not her, remains in possession of the AgencyBloc reports and why her attorney delivered copies of those reports to Silvur's counsel as part of their commission negotiations.

Silvur's final theory is that Palmer's use of this information to negotiate her disputed compensation causes it irreparable harm. (*See* Reply Br. 11–12.) But Silvur has put forward no specific facts establishing how the harm arising from Palmer's attorney's continued possession of its confidential information is *not* quantifiable after the fact. *See Grassi v. Grassi*, No. 24-3291, 2024 WL 4715614, at *3–4 (6th Cir. Nov. 5, 2024) (concluding that mere possession of a trade secret may not entitle movant to injunctive relief in all cases). There is no indication that customer goodwill is diminished from Palmer's attorney's possession of Silvur's confidential information because there is no evidence that Silvur's customers are aware he possesses its data. Nor does her attorney's possession of the information change the outcome of this litigation as this Court does not presume that Silvur would destroy or lose discoverable information related to Palmer's claims. Lastly, to the extent that it is difficult to calculate the harm from Palmer's attorney holding confidential information relevant to her claims against Silvur during the pendency of this litigation, it is because the harm is almost certainly *de minimis*.[3]

[3] Having concluded that Defendant cannot show the "mandatory" requirement of irreparable harm, *D.T.*, 942 F.3d at 327, the Court will not address the remaining elements concerning the balancing of the harms and the public interest.

**CONCLUSION**

Silvur will likely succeed on the merits of its claims that Palmer has misappropriated its trade secrets under MUTSA and DTSA. However, because Silvur has not shown it will suffer irreparable harm from Palmer's attorney being in possession of its confidential customer information, the Court denies its motion for preliminary injunctive relief.

An order consistent with this Opinion will issue.

Dated: October 2, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE